Valerie E. WILLIAMS, Plaintiff,

v.

WOODHULL MEDICAL AND MENTAL HEALTH CENTER; New York University Langone Medical Center Millhauser Labs; City of New York; Michael R. Bloomberg, as mayor, New York City Health and Hospital Corporation; Edward Fishkin, M.D., Network Medical Director, Woodhull Medical & Mental Health Center; Leonel Urcuyo, M.D., Chair, Executive Committee of the Medical Staff, Woodhull Medical & Mental Health Center; and Paul H. Kastell, M.D., Chairman, Obstetrics and Gynecology, Woodhull Medical & Mental Health Center, Defendants.

No. 10–CV–1429 (NGG)(LB).

United States District Court, E.D. New York.

Aug. 27, 2012.

Anthony L. Pendergrass, Buffalo, NY, for Plaintiff.

Daniel Sergio Gomez-Sanchez, NYC Law Department, New York, NY, for Defendants.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

Plaintiff, Valerie E. Williams ("Williams"), brings this action against defendants Woodhull Medical and Mental Health Center ("Woodhull"), New York University Langone Medical Center Millhauser Labs ("NYU"), the City of New York, the New York City Health and Hospital Corporation ("NYCHHC"), Dr. Edward Fishkin, Dr. Leonel Urcuyo, and Dr. Paul Kastell, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and New York state law. (See Compl. (Docket Entry # 1).) All of the defendants (collectively "Defendants") moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (See Defs. Mot. for Sum. J. (Docket Entry # 45).) On February 10, 2012, the court referred Defendants' Motion to Magistrate Judge Lois Bloom for a Report and Recommendation ("R & R") pursuant to Federal Rule of Civil Procedure 72(b). (Feb. 10, 2012, Order.) On June 11, 2012, Judge Bloom recommended that the court grant Defendants' motion for summary judgment and dismiss Williams's action. (R & R (Docket Entry # 62) at 30.) On June 26, 2012, Judge Bloom granted Williams an extension of time to file objections to the R & R, setting a deadline of July 30, 2012. (Docket Entry # 65.)

On July 30, 2012, Williams filed two objections to the R & R: one was filed by her attorney ("Pendergrass Objection") (Docket Entry # 68); the other was filed pro se ("Pro Se Objection") (Docket Entry # 67). Defendants have a memorandum in opposition to the objections. (Defs. Opp'n Mem. (Docket Entry # 69).) As set forth below, Defendants' motion for summary

judgment is granted. The court assumes familiarity with the facts of this case.

## I. PROCEDURAL HISTORY

Williams commenced this action pro se on March 30, 2010. (*See* Compl.) She later acquired an attorney. (*See* Notice of Appearance of Anthony L. Pendergrass (Docket Entry # 24).) After doing so, Williams filed an Amended Complaint on consent. (Docket Entry # 26.) The parties engaged in discovery (*see, e.g.*, Stipulation and Protective Order (Docket Entry # 30)), and Defendants then sought leave to move for summary judgment (*see* Pre-Motion Conference Request (Docket Entry # 32)). The court referred that request to Magistrate Judge Lois Bloom for decision and for a settlement conference. (May 10, 2011 Order (Docket Entry # 33).) Judge Bloom attempted to mediate a settlement; however, when those efforts did not succeed, Judge Bloom set a schedule for Defendants to move for summary judgment and for Williams to move to further amend her complaint. (Aug. 8, 2011 Order.)

On August 19, 2011, Williams sought leave to amend her Complaint to add a new retaliation claim under Title VII and to drop her breach of contract claim. (*See* Pl. Mot. to Am Compl. (Docket Entry # 35.)) The court referred this motion to Judge Bloom (Oct. 28, 2011 Order), who recommended that the motion be denied and that Plaintiff's breach of contract claim be dismissed (R & R (Docket Entry # 44).) After the period to object lapsed without any objections, the court denied Williams' motion to amend and dismissed her breach of contract claim pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. (*See* Feb. 16, 2012 Order (Docket Entry # 61).)

Defendants served Williams with their Motion for Summary Judgment on September 19, 2011. (*See* Defs. Mot. for Sum. J.) The court referred this motion to Judge Bloom. (Feb. 10, 2012 Order.) Williams sought two extensions of time to oppose Defendants' Motion for Summary Judgment. (*See* Oct. 24, 2011 Pl. Mot. (Docket Entry # 38); Nov. 29, 2011 Pl. Mot. (Docket Entry # 39).) Both were granted. (Oct. 24, 2011 Order; Nov. 30, 2011 Order.) On December 27, 2011, Williams's attorney moved for leave to withdraw from the case (*See* Mot. to Withdraw as Att'y (Docket Entry # 40).) Judge Bloom denied that motion (*see* Dec. 27, 2011 Order (Docket Entry # 42)), and Williams's attorney has continued to represent her following Judge Bloom's Order (*see, e.g.*, Pendergrass Objection).

On January 17, 2012, Williams opposed Defendants' motion for summary judgment. (Pl. Opp'n Mem. (Docket Entry # 58–2).) Defendants replied on February 10, 2012. (Defs. Reply Mem. (Docket Entry # 60).) On June 11, 2012, Judge Bloom issued her R & R on this motion, recommending that the court grant Defendants' motion for summary judgment and dismiss Williams's action. (*See* R & R at 334.) On June 20, 2012, Williams filed a pro se request for an extension of time to file objections to the R & R. (Pl. Mot. (Docket Entry # 63).) On June 25, 2012, Williams's attorney also filed a motion for extension of time to file objections to the R & R on her behalf. (Docket Entry # 64.) On June 26, 2012, Judge Bloom granted the motions for extension of time to file objections. (Docket Entry # 65.)

On July 30, 2012, Williams filed two Objections to the June 11, 2012 R & R: one was filed by her attorney (Pendergrass Objection); the other was filed pro se (Pro Se Objection).

## II. STANDARD OF REVIEW

### A. Review of Magistrate Judge's Report and Recommendations

In reviewing the report and recommendation of a dispositive matter from a

magistrate judge, the district court "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." *La Torres v. Walker*, 216 F.Supp.2d 157, 159 (S.D.N.Y.2000); *see also Gesualdi v. Mack Excavation & Trailer Serv., Inc.*, No. 09–CV–2502 (KAM)(JO), 2010 WL 985294, at *1, 2010 U.S. Dist. LEXIS 23620, at *3 (E.D.N.Y. Mar. 15, 2010) ("Where no objection to the Report and Recommendation has been filed, the district court need only satisfy itself that there is no clear error on the face of the record.") (internal quotation marks and citation omitted).

■ The district court reviews de novo "those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1). However, to obtain this de novo review of a magistrate judge's R & R, an objecting party "must point out the specific portions of the report and recommendation to which [he or she] object[s]." *U.S. Flour Corp. v. Certified Bakery, Inc.*, No. 10–cv–2522 (JS)(WDW), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012); *see also* Fed.R.Civ.P. 72(b)(2) ("[A] party may serve and file *specific* written objections to the [R & R]." (emphasis added)). If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y.2008); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir.2002) (holding that plaintiffs objection to an R & R was "not specific enough" to "constitute an adequate objection under [ ] Fed.R.Civ.P. 72(b)").

■ "The objections of parties appearing *pro se* are 'generally accorded leniency' and should be construed 'to raise the strongest arguments that they suggest.'" *DiPilato v. 7–Eleven, Inc.*, 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (quoting *Milano v.*

*Astrue*, 05–CV–6527, 2008 WL 4410131, at *24 (S.D.N.Y. Sept. 26, 2008)). However, even where an objection has been filed pro se, "[a]n objection to a report and recommendation in its entirety does not constitute a specific written objection within the meaning of Rule 72(b)." *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07–cv–4175 (NGG)(RLM), 2008 WL 4693246, at *1 (E.D.N.Y. Oct. 17, 2008)

## B. Summary Judgment

■ Under Federal Rule of Civil Procedure 56(a), a motion for summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The burden of showing the absence of any genuine dispute as to a material fact rests on the movant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Res. Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994). The nonmoving party may not rest on "mere allegations or denials" of the moving party's pleadings to survive summary judgment, but must demonstrate by

affidavit or other admissible evidence "that there is a genuine issue of fact for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine issue [is not] created merely by the presentation of assertions that are conclusory." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004). Likewise, "conjecture[ ] or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

## III. DISCUSSION

### A. Un–Objected to Recommendations

No party has objected to Judge Bloom's recommendation that the court should not decline jurisdiction over this case under the doctrine of primary jurisdiction (R & R at 324), nor has any party objected to Judge Bloom's recommendation that the following claims be dismissed: Williams's race and sex discrimination claims pursuant to 42 U.S.C. §§ 1981, 1985, and 1986 (*id.* at 12), and related claims for negligent and intentional infliction of emotional distress (*id.*); her hostile work environment claim pursuant to Title VII of the Civil Rights act of 1964 (*id.* at 14–19); and her due process claim pursuant to 42 U.S.C. § 1983 (*id.* at 24–29). The court has reviewed the record and Judge Bloom's thorough and well-reasoned R & R for clear error and found none. Therefore, the court adopts these portions of the R & R, and notes that the parties have waived further judicial review of this issue by failing to object. *See Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd, & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010) ("[A] party waives appellate review of a decision in a magistrate judge's Report and Recommendation if the party fails to file timely objections designating the particular issue."). Ac-

cordingly, the court dismisses these claims with prejudice.

### B. Williams's Pro Se Objections

In her pro se objection to the R & R, Williams 1) recounts the deterioration of her relationship with counsel, 2) claims that the withdrawal of her breach of contract claim, prior to the R & R's issuance, was without her knowledge or consent, and 3) disputes two of the facts included in Defendant's statement of undisputed facts pursuant to Local Civil Rule 56.1(a). (*See* Pro Se Objection at 1–3.) Despite the lenient construction accorded pro se objections, none of Williams' objections prompts de novo review of any aspect of Judge Bloom's R & R.

#### 1. *Relationship with Counsel*

In her objection to the R & R, Williams reiterates that her relationship with counsel has been unsatisfactory. (*See id.* at 1–3.) As noted above, this issue has been raised previously: Williams's attorney moved for leave to withdraw from her case on December 15, 2011 as a result of their declining relationship (*see* Mot. to Withdraw as Att'y), and Judge Bloom denied that motion (*see* Dec. 27, 2011 Order). Williams's attorney has since continued to represent her. (*See, e.g.,* Pl. Opp'n Mem.; Pendergrass Objection). In a subsequent letter to Judge Bloom, Williams acknowledged this continued representation. (*See* July 6, 2012 Pl. Ltr. (Docket Entry # 66) ("I shall assume that he and his co-counsel want to continue to be my representation in this matter and will be filing the necessary documents for my appeal.").) Williams's attorney has since filed the objection to the R & R (*see* Pendergrass Objection) that she seemed to anticipate in her letter.

██ Williams' comments in her pro se objection about her relationship with her

attorney do not address or object to any of the recommendations in Judge Bloom's R & R. Williams does not discuss how her relationship with her attorney affected the validity of Judge Bloom's R & R. To the extent that they represent a generalized objection to the entire R & R, such an objection "does not constitute a specific written objection within the meaning of Rule 72(b)," and therefore does not lead to de novo review of any portion of the R & R. *Healing Power, Inc.,* 2008 WL 4693246, at *1.

### 2. *Breach of Contract Claim*

 Williams asserts that her attorney withdrew her breach of contract claim without her knowledge or consent. (*See Pro Se* Objection at 1.) Williams' attorney filed a motion on August 19, 2011, seeking, *inter alia,* to withdraw her breach of contract claim. (*See* Pl. Mem. in Supp. of Mot. to Amend Compl. (Docket Entry # 35-3) at 2 ("Plaintiff seeks to amend the complaint by deleting the Breach of Contract causes of action.").) Williams' attorney made this motion well before he moved to withdraw from the case. In a previous Report and Recommendation, filed January 31, 2012, 2012 WL 555313, Judge Bloom responded to that motion by recommending that Williams' breach of contract claim be dismissed rather than allow Williams to amend her Complaint to withdraw the claim. (*See* R & R at 320–21.) No party objected, and the court adopted Judge Bloom's January 31, 2012 Report and Recommendations in its entirety. (*See* Feb. 16, 2012 Order.) Dismissal of Williams's breach of contract claim is

therefore not subject to further review by the court. *See Wagner & Wagner, LLP,* 596 F.3d at 92. If Williams believes that this decision on the part of her attorney compromised her case, then her recourse is a separate action against her attorney.

### 3. *Disputed Facts in Defendant's Rule 56.1 Statement*

Finally, Williams asserts that the "only evidence and statements presented" in the Report and Recommendation are Defendants', noting two such statements about the neonatal fatality that she now disputes: (1) "Plaintiff approved a 35 year old patient who was in early labor for a vaginal delivery," (R & R at 318 (citing Defs. 56.1 Statement (Docket Entry # 46) ¶¶ 17–18)) and (2) "[T]he mother returned to the hospital several days after the delivery and was treated for a uterine rupture" (*id.* (citing Defs. 56.1 Statement ¶¶ 24, 28)). With regard to the first statement, Williams states in her objection that she was not involved in prenatal care of the patient, was bound by the patient's stated wish to not perform a caesarian delivery, and that the patient continued to decline a caesarian once the patient was warned of the fetus's slow heartbeat; with regard to the second statement, Williams states that the patient was not treated with surgery, only antibiotics. (*See Pro Se* Objection at 2–3.)

Judge Bloom clearly did not commit any error by relying on the statements to which Williams now objects, based on the record before Judge Bloom at the time she issued the R & R.[1] The new facts that

---

1. As Judge Bloom explained in her R & R, "Defendants submitted a statement of undisputed material facts pursuant to Local Civ. R. 56.1(a)" to accompany their motion for summary judgment. (R & R at 317 n. 1.) The Local Rules required the party opposing the motion, here Williams, to answer this state-

ment. *See* Local Civ. R. 56.1(b). "[U]nless specifically controverted by a correspondingly numbered paragraph" in the opposing party's reply, "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for pur-

Williams attempts to add in her objections do not contradict the accuracy of Defendants' 56.1 Statement per se; Williams believes this additional information clarifies the statement the Defendants offered. (Pro Se Objection at 2.) However, Williams does not assert that any of Judge Bloom's recommendations depended upon the facts Williams now disputes. Nothing in Judge Bloom's analysis depended on knowing whether Williams was the patient's treating physician before the patient entered into labor, or if the patient was warned about the fetus's bradycardia, or if the patient was treated for a uterine rupture by surgery or antibiotics. Therefore, her comments about these facts do not amount to an objection to any of the recommendations in the R & R. To the extent that they represent a general objection to the R & R overall, this objection "does not constitute a specific written objection within the meaning of Rule 72(b)," and does not prompt de novo review of any portion of the R & R. *Healing Power, Inc.*, 2008 WL 4693246, at *1.[2]

### C. Retaliation Claim

In a separate document, filed by her attorney, Williams objects to Judge Bloom's recommendation that Defendants' motion for summary judgment be granted as to Williams's claims of retaliation under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"). (*See* Pendergrass Objection at 1.) Williams claims that Defendants engaged in "a plethora" of adverse actions subsequent to her meeting with Reginald Odom, a vice-president at her employer, at which she complained that she was the target of discrimination. (*Id.* at 3.) The adverse actions Williams refers to are Defendants' 1) failure to convene the Preliminary Informal Review Committee to review Dr. Kastell's request for corrective action against Williams, which allegedly deprived her of an opportunity to "address the issues that were raise[d] relative to her professional conduct," 2) alleged delay in reporting an unexpected neonatal death to the State of New York Department of Health, Office of Professional Medical Misconduct, and 3) termination of Williams's employment. (*See id.* at 3.) Because these alleged actions occurred after Williams' contact with Odom, she argues that their timing gives rise to an inference that the Defendants engaged in these actions in retaliation for

poses of the motion." Local Civ. R. 56.1(c). As Judge Bloom further explained in her R & R, she did not rely simply on the statements in Defendants' 56.1(a) statement, but "deem[ed] admitted only those facts ... that [were] supported by admissible evidence and not controverted by the record." (R & R at 317 n. 1 (citing *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).) Williams' response to Defendants' 56.1 statement did not contradict the "undisputed facts" asserted by Defendants about the neonatal fatality, and because Defendants' 56.1 Statement cited to apparently admissible evidence in support of their description of the neonatal fatality (*see* Gomez–Sanchez Decl. Ex. D (Docket Entry # 55–4)), those assertions were properly admitted for the purposes of the motion, per Local Civ. R. 56.1(c).

2. The court notes also Williams' reference to an April 2, 2012, letter to the court in which she asked the court to allow her to locate other counsel because, she alleged, Mr. Pendergrass has neglected her case; Williams objects to the court's lack of specific response to this letter. (Pro Se Objections at 3.) Regardless of whether the court replied to Williams' letter, Williams was free to replace her attorney with a different one, or represent herself. This court and Judge Bloom both gave Williams multiple opportunities to file an opposition to both the summary judgment motion and the R & R about the motion, as the procedural history discussed above indicates. The court believes that Williams had received adequate opportunities to make her case, whether with her current attorney or a different one.

Williams's protected conduct, in violation of Title VII. (*Id.* (citing *Gorzynski v. Jet-Blue Airways Corp.*, 596 F.3d 93, 110 (2d Cir.2010).) Although Williams acknowledges that Defendants have provided non-retaliatory reasons for their actions, she argues that summary judgment is improper because "it is not inconceivable that a reasonable jury might find the explanations offered by Defendants to be nothing more than pretextual." (*Id.* at 4.)

The court considers this argument and reviews the portion of Judge Bloom's report that addresses the retaliation claims de novo.

### 1. *Retaliation Standards Under Title VII*

■ Analysis of a motion for summary judgment Title VII retaliation claim proceeds according to a burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir.2010). Under this framework, the plaintiff bears the initial burden to "establish a prima facie case of retaliation," by showing "(1) that [he or] she participated in a protected activity, (2) that [he or] she suffered an adverse employment action, and (3) that there was a causal connection between [his or] her engaging in the protected activity and the adverse employment action." *Id.* at 110 (citing *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir.2006)).

■ One method of showing causation in retaliation cases is indirectly, "by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001) (internal quotation marks and alterations omitted); *see also Gorzynski*, 596 F.3d at

110. However, if "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, [then] an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001).

■ "If a plaintiff sustains the initial burden" of establishing a prima facie case of retaliation, "a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998)). "However, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citing *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120–21 (2d Cir. 1997)).

### 2. *Williams's Retaliation Claim*

In her Amended Complaint, Williams alleged that Defendants took adverse employment actions in retaliation against her following her April 10, 2009 complaint to Reginald Odom, her employer's Vice President of Employee and Labor Relations, that she had been subjected to a hostile work environment resulting from impermissible race and sex discrimination. (*See* Am. Compl. ¶¶ 36–37.) The alleged adverse actions included 1) removing her from the on-call schedule as an Attending physician in Labor and Delivery; 2) reassigning her to conduct a research project; 3) initiating an investigation with, and making a report of Williams's alleged negligence to, the State of New York Depart-

ment of Health Office of Professional Medical Misconduct, regarding the unexpected neonatal death of one of Williams's patients; and 4) failure to reappoint her to her position as an Attending OB–GYN Physician.[3] (*See id.* ¶¶ 39, 42, 59, 57; Pl. Opp'n Mem. at 9.) Williams claimed that Defendants took these actions in retaliation for her complaint to Odom and subsequent, related complaints, in violation of Title VII. (*Id.* ¶¶ 117–21.) Williams also claimed that Defendants failed to "provide [Williams] with due process when she requested to avail herself of the remedies provided for by the bylaws and rules of the Defendants," referring to Defendants' failure to convene the Preliminary Informal Review Committee to review Dr. Kastell's request for corrective action against her. (Pl. Opp'n Mem. at 9.) According to Williams, this last action was retaliatory because it deprived her of an opportunity to "address the issues that were raise[d] relative to her professional conduct." (Pendergrass Objection at 3.)

■ Williams argues that Defendants' adverse actions followed in close temporal proximity to her protected conduct, and that this establishes her prima facie case of retaliation under the principle expressed in *Gorzynski* and *Gorman–Bakos*. (*See* Pendergrass Objection at 3.) This argument fails because the adverse actions taken against her began well before she complained to Odom that she was being subjected to a hostile work environment. Williams acknowledges that her troubles with Defendants began in October 2008, following an unexpected neonatal fatality that occurred while she was the on-call

attending obstetrician in the Labor and Delivery department at Woodhull (*see* Pl. 56.1 Statement (Docket Entry # 58) ¶ 7; Defs. 56.1 Statement ¶ 16.); that she was removed from her assignment in labor and delivery in November, 2008, following that incident (*see* Pl. 56.1 Statement ¶ 9); that Dr. Kastell "initiated a 'Request for Corrective Action' " against Williams in March 2009 (*see id.* at ¶ 12); and that she was notified later that month of Dr. Kastell's request and the resulting plan for a Preliminary Informal Review Committee meeting (*see id.* ¶ 13). All of these events occurred prior to Williams's April 10, 2009 complaint to Odom. Where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. Thus, Williams cannot establish a prima facie case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which Williams complains occurred after she engaged in protected activity.

■ Even if Williams could establish a prima facie case of retaliation, which she cannot, Defendants have articulated legitimate, non-retaliatory reasons for the adverse actions taken against her. Defendants attribute their decision to remove Williams from the on-call schedule and reassign her to a research project to the neonatal fatality that occurred in October 2008. (*See* Defs. Mem. in Supp of Mot. for Summ. J. (Docket Entry # 56) at 18 ("Alan Aviles, President and Chief Executive Offi-

---

**3.** Williams also alleged that Defendants retaliated against her by denying her a leave of absence to attend a Continuing Medical Education course (*see* Am. Compl. ¶ 53), however, she has not addressed this claim in any way in her opposition brief (*see* Pl. Opp'n Mem. at 8–9). Therefore, the court considers this

claim abandoned. *See Robinson v. Roosevelt Union Free Sch. Dist.,* No. 10–CV–834 (SJF)(ETB), 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) (citing *Taylor v. City of New York,* 269 F.Supp.2d 68, 72 (E.D.N.Y. 2003)).

cer of HHC, demanded that plaintiff be removed from patient contact after a blind review of her actions with respect to the bad outcome in October 2008 because he was concerned about the quality of care she was providing to the patients at Woodhull.").) Defendants assert that Williams was reported to the State of New York Department of Health Office of Professional Medical Misconduct because, "pursuant to statute, patient deaths must automatically be reported to the State of New York."[4] (*Id.*) *See* N.Y. Pub. Health Law § 2805–*l* (2)(a) (McKinney 2011.) Defendants cited Dr. Kastell's recommendation as justification for their decision not to reappoint Williams to her position; Dr. Kastell claimed that "she ha[d] evidenced a series of gross errors in clinical judgment, assessment of patients['] clinical conditions and negligent decision making." (*Id.*) Regarding Williams's claims that Defendants failed to convene a Preliminary Informal Review Committee meeting to review Dr. Kastell's request for corrective action against her, Defendants answered that "between April 2009 and October 2009," several attempts were made to schedule this meeting, but "Plaintiff s attorneys continued to advise [HHC's counsel] that they were unprepared to conduct the Preliminary Informal Review." (Hartman Decl. (Docket Entry # 50) ¶¶ 9–10.)

Defendants have articulated legitimate, non-retaliatory reasons for their adverse employment actions against Williams. Therefore, even if she had established a prima facie case of retaliation, the burden would again fall to her to "show that retaliation was a substantial reason for the adverse employment action[s]." *Jute*, 420 F.3d at 173. Williams has not argued that the reasons Defendants provided for these actions were pretextual, and has introduced no evidence to support such an inference. Thus, Williams has not shown that a genuine issue of material fact exists in her case. *See Patterson v. N.Y.*, 375 F.3d at 219 (holding that a genuine issue of material fact is not "created merely by the presentation of assertions that are conclusory."). Because no rational jury could find in her favor on these facts, summary judgment is proper. *See* Fed. R. Civ. P 56(a); *Gallo*, 22 F.3d at 1224.

### D. Conclusion

For the reasons set forth above, the court ADOPTS Judge Bloom's R & R in its entirety; accordingly, Defendants' motion for summary judgment is GRANTED.

SO ORDERED.

---

4. According to Defendants, the incident was first reported to the State of New York Department of Health in time to comply with that department's guidelines concerning the unexpected death of a patient (*see* Defs. 56.1 Statement ¶¶ 25–27), and the Office of Professional Medical Misconduct was aware of the incident by at least February 2009, when it requested records pertaining to the incident (*see* Gursky Decl. (Docket Entry # 49) ¶ 9). Williams has introduced no evidence in support of her assertion that Defendants initiated the investigation with the Office of Professional Misconduct subsequent to, and because of, her protected conduct in April 2009. Her claim appears to be based only on the statement in her Complaint that she was not notified of the investigation until "November 7, 2009, [when she] received a certified letter from the Office of Professional Medical Conduct, dated November 2, 2009, informing her that she was being investigated because of alleged negligence" (Pl. Am. Compl. ¶ 58.) Even if this claim were supported by admissible evidence, which it is not, this statement would establish only the date on which she was notified of the investigation by the agency. It would not contradict Defendants' assertion that that incident was reported within the time period established by the State of New York Department of Health. Thus, there is no evidentiary support for the claim that Defendants reported the neonatal fatality to the State government after Williams' protected activity.

## REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge:

Plaintiff, Dr. Valerie Williams, brings this civil action against defendants Woodhull Medical and Mental Health Center ("Woodhull"), New York University Langone Medical Center—Millhauser Labs ("NYU"), the City of New York, the New York City Health and Hospital Corporation ("NYCHHC"), Dr. Edward Fishkin, Dr. Leonel Urcuyo, and Dr. Paul Kastell pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and New York state law. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Honorable Nicholas G. Garaufis referred defendants' motion to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the following reasons, it is respectfully recommended that defendants' motion for summary judgment should be granted.

## BACKGROUND

■ Plaintiff, a black female doctor, was hired by Woodhull Medical Group, P.C. in 2000 to work as an attending physician in the Department of Obstetrics and Gynecology at Woodhull. (Docket entry 46, Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1 Statement"), ¶¶ 12, 14.[1]) After graduating from Skidmore College and Dartmouth Medical School, plaintiff did a four-year residency in the Obstetrics and Gynecology Department of SUNY Downstate Medical Center and then worked at several different hospitals over the course of fifteen years before arriving at Woodhull. (Docket entry 58, Pendergrass Decl. at Ex. 1 ("Pl.'s Depo."), pp. 18–33.) Woodhull is a hospital operated by NYCHHC, a public benefit corporation created by statute. (Defs.' 56.1 Statement, ¶¶ 2–3.) Until July 1, 2007, Woodhull Medical Group, P.C. provided staffing for clinical patient care services at Woodhull pursuant to an affiliate agreement. (*Id.* at ¶¶ 5–6.) In July 2007, NYU took over from Woodhull Medical Group, P.C. under an affiliate agreement and plaintiff became employed by NYU. (*Id.* at ¶¶ 6, 15.)

Plaintiff served on the Woodhull medical staff from 2000 through 2008 pursuant to four consecutive two-year contracts. (Pl.'s Depo., p. 131.) Under the Medical and Dental Staff Bylaws for Woodhull (the "Bylaws"), appointments to the medical staff and grants of clinical privileges generally are for a two-year period. (Docket entry 55, Gomez–Sanchez Decl. at Ex. K, p. 8.) However, a doctor who has been the subject of disciplinary action may be appointed for less than two years. (*Id.*) In January 2004, Dr. Kastell was hired as the Chief of the Obstetrics and Gynecology Department at Woodhull. (Pendergrass Decl. at Ex. 6, p. 9.) On September 8, 2008,

---

1. Defendants submitted a statement of undisputed material facts pursuant to Local Civil Rule 56.1(a). (Defs.' 56.1 Statement.) Plaintiff did not file a proper counter-statement pursuant to Local Rule 56.1(b), which requires the nonmoving party to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). As such, the Court may deem the facts in defendants' Rule 56.1 statement admitted. *See* Local Civ. R. 56.1(c). However, the Court may not rely solely on the statement of undisputed facts contained in the Rule 56.1 statement: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). Accordingly, the Court deems admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by the record.

Dr. Kastell performed an evaluation of plaintiff in connection with her biannual reappointment. (Gomez–Sanchez Decl. at Ex. H.) Dr. Kastell rated plaintiff superior in seven categories and satisfactory in nine categories of the evaluation. (*Id.*)

Plaintiff was the on-call attending obstetrician in the Department of Labor and Delivery at Woodhull on the night of October 19, 2008, when the event that the parties refer to as the "bad outcome" occurred.[2] (Defs.' 56.1 Statement, ¶ 16.) Plaintiff approved a 35 year old patient who was in early labor for a vaginal delivery. (*Id.* at ¶¶ 17–18.) When the fetal heart rate dropped at around 12:30 a.m. on October 20, 2008, the nursing staff paged plaintiff several times without a response and eventually reached plaintiff on her cell phone. (*Id.* at ¶¶ 19, 22.) Plaintiff was in the hospital's gym in the basement. (Pl.'s Depo., p. 105.) A slow fetal heart rate was noted at 2:02 a.m. and continued until plaintiff delivered the baby at 2:43 a.m. (Defs.' 56.1 Statement, ¶ 23.) The baby died several days later and the mother returned to the hospital several days after the delivery and was treated for a uterine rupture. (*Id.* at ¶¶ 24, 28.)

Upon Dr. Kastell's request, Dr. Cyrus McCalla, the Director of Maternal Fetal Medicine at Woodhull, performed an independent review of the delivery. (Docket entry 54, McCalla Decl., ¶ 7.) Dr. McCalla concluded that plaintiff "exhibited poor clinical judgment and a lack of competence in her handling of the delivery." (*Id.* at ¶ 8.) Specifically, Dr. McCalla found that plaintiff "committed egregious errors when she failed to properly read the fetal heart monitoring strips, and failed to perform a cesarean section at an earlier period." (*Id.* at ¶ 14.) After Dr. McCalla conducted his review, Dr. Kastell and Dr. McCalla met with plaintiff on October 21, 2008 regarding her handling of the delivery. (Kastell Decl., ¶ 4; McCalla Decl., ¶ 16; Gomez–Sanchez Decl. at Ex. F.) At the meeting, Dr. Kastell went over the heart monitoring strips with plaintiff and told plaintiff that she should have delivered the baby sooner. (Pl.'s Depo., p. 98.) Plaintiff testified at her deposition that Dr. Kastell "told me that he had not ever seen a patient tak[en] care of in the fashion that I had taken care of a patient, since he had been there." (*Id.* at p. 63.) Plaintiff described Dr. Kastell's behavior at the meeting as "totally inappropriate" and "very condescending," and stated that "when I spoke to him and I was trying to explain, his attitude was that, like he did not want to hear anything that I had to say." (*Id.* at p. 64.) Plaintiff further testified that Dr. Kastell "made me so upset during this conversation, that I, um, was almost in tears." (*Id.*) Dr. Calvin Thomas, the Deputy Chief of Services for the Obstetrics and Gynecology Department at Woodhull, conducted a further review of the delivery in November 2008 and concluded that plaintiff "committed egregious errors when she failed to properly read the fetal heart monitoring strips, notice the fetal distress, and failed to perform a cesarean section at the first signs of distress, and the resultant delay in delivering the fetus vaginally, caused the fetus to be delivered oxygen deprived, and resulted in the baby's death." (Docket entry 47, Thomas Decl., ¶¶ 7, 15.)

Woodhull's Risk Management Department reported the neonatal death to the New York State Department of Health through the New York Patient Occurrence Reporting and Tracking System, as required by Section 2805–*l* of the New York

---

**2.** The "bad outcome" refers to "plaintiff's delivery of a brain damaged fetus due to oxygen deprivation on October 20, 2008 … "[where] [t]he fetus expired a few days" later. (Kastell Decl., ¶ 4.)

Public Health Law. (Docket entry 49, Gursky Decl., ¶¶ 4–5, 7.) Dr. Kastell testified that:

> [c]ertain cases automatically are reported to New York State. Based upon the severity of the outcome, it automatically triggers a sentinel event, independently of the chairman of the department. An unexpected death, which in this case the death of the infant was an unexpected death, this case was part of the NY-PORT System, it got reported to New York State, that automatically triggered the sentinel event committee. It has nothing to do with me as chairman.

(Pendergrass Decl. at Ex. 6, pp. 70–71.) Reports of incidents through the New York Patient Occurrence Reporting and Tracking System can trigger a separate investigation by the Office of Professional Misconduct. (Gursky Decl., ¶ 8.) In February 2009, the New York State Department of Health's Office of Professional Misconduct commenced an investigation into the neonatal death.[3] (*Id.* at ¶ 9.)

In November 2008, Dr. Kastell reassigned plaintiff from the obstetrical management of patients, but continued her assignment to the gynecological management of patients. (Pendergrass Decl. at Ex. 6, pp. 154–156; Kastell Decl., ¶¶ 8, 15.) Dr. Kastell states that because of several incidents between September 14, 2008 and November 4, 2008, "and the overarching concern that patient safety must come first, I determined that plaintiff exhibited poor clinical judgment and exhibited poor skills that she would endanger the lives of patients requiring obstetrical case." (Kastell Decl., ¶¶ 8–15.) Although Dr. Kastell reassigned plaintiff from the obstetrical management of patients, the decision to

remove plaintiff from obstetrical duties "was a group decision," made by a committee that included himself, Dr. Fishkin, and others. (Pendergrass Decl. at Ex. 6, pp. 155–156.) Dr. Kastell testified that "it was the recommendation of the committee that [plaintiff] be taken off obstetrical duties while we went ahead" with corrective action against her. (*Id.*) The Bylaws provide for corrective action "whenever activities or professional conduct of any member of the Hospital Medical and Dental Staff (Medical Staff) are, or reasonably appear to be, below the standards and expectations of the Medical Staff, ... or detrimental to patient, staff or visitor safety." (Gomez–Sanchez Decl. at Ex. K, p. 18.)

On December 11, 2008, plaintiff was reappointed to the medical staff at Woodhull for a period of one year, ending November 5, 2009. (Gomez–Sanchez Decl. at Ex. J.) Prior to plaintiff's reappointment, Dr. Fishkin recommended to the Credentials Committee that, in light of the October 20, 2008 incident that occurred "[w]hile [plaintiff's] re-appointment application was being reviewed," "the fairest and most appropriate response would be to recommend a one year re-appointment of [plaintiff] with no change in her clinical privileges." (Gomez–Sanchez Decl. at Ex. I; docket entry 52, Fishkin Decl., ¶ 14.) Dr. Fishkin noted that the October 20, 2008 incident "warrants separate examination," but "[b]ecause of the timing of that incident, it was not possible to complete that examination prior to the time that a decision had to be made on [plaintiff's] reappointment application." (Gomez–Sanchez Decl. at Ex. I.)

On March 10, 2009, Dr. Kastell officially requested corrective action against plain-

---

**3.** By letter dated June 21, 2011, the Office of Professional Misconduct issued plaintiff an administrative warning, which did not constitute formal disciplinary action against plain-

tiff's medical license, and administratively closed its case against plaintiff. (Gomez–Sanchez Decl. at Ex. MM.)

tiff pursuant to the Bylaws, stating that plaintiff "has demonstrated an unacceptable level of professional competence and clinical judgment that places the welfare and safety of patients at risk."[4] (Gomez–Sanchez Decl. at Ex. D.) Dr. Kastell based his request for corrective action on the October 20, 2008 delivery as well as four other incidents that occurred between September and November 2008.[5] (*Id.*) Dr. Kastell testified that "[i]t was not my decision alone to do the corrective action, it was done as a result of the sentinel event committee, made up of different people in the hospital ... [and] [t]heir recommendation was corrective action." (Pendergrass Decl. at Ex. 6, p. 71.) A Preliminary Informal Review Committee was scheduled to convene on March 31, 2009 to review Dr. Kastell's request for corrective action. (Gomez–Sanchez Decl. at Ex. L.) The Bylaws provide that the Preliminary Informal Review Committee conducts a review of the request for corrective action

and issues a report with findings and recommended corrective action, which the Executive Committee may adopt or reject. (Gomez–Sanchez Decl. at Ex. K, pp. 20–21.) Only after the Executive Committee sends notice of the proposed disciplinary action may a doctor request a formal hearing pursuant to the Bylaws. (*Id.* at p. 22.) Upon request of plaintiff's union, the Preliminary Informal Review Committee scheduled for March 31, 2009 was adjourned. (Gomez–Sanchez Decl. at Ex. M.) Between April 2009 and October 2009, the Senior Counsel for NYCHHC unsuccessfully attempted to schedule the Preliminary Informal Review Committee on several occasions.[6] (Docket entry 50, Hartman Decl., ¶¶ 9–10.)

After Dr. Kastell requested that corrective action be taken against her, plaintiff internally complained that Dr. Kastell had harassed her to Reginald Odom, the Vice President of Employee and Labor Relations at NYU, on April 10, 2009.[7] (Pl.'s

---

4. Dr. Kastell previously requested that corrective action be taken against plaintiff for incidents that occurred in 2004. (Pendergrass Decl. at Ex. 6, pp. 21–22.) No corrective action under the Bylaws resulted from Dr. Kastell's request regarding those incidents. (*Id.* at pp. 75–76.)

5. Dr. Kastell testified at his deposition that plaintiff "had a bad outcome, where she killed a baby and ruptured a woman's uterus, because she didn't follow hospital policy. Then, she turned around and over the course of the next three weeks, she had five cases where she had to call someone in to bail her out, okay. That's not someone who should be practicing in a hospital." (Pendergrass Decl. at Ex. 6, p. 162.) Dr. Kastell stated that plaintiff "was unable to repair the adhesions without help" after a delivery on September 14, 2008, "was unable to control bleeding" during "a routine caesarean section surgical procedure" on September 15, 2008, "called for surgical assistance on a routine caesarean section procedure" on October 14, 2008 where there was "uncontrolled bleeding," and "requested that another doctor perform" two caesarian section procedures on Novem-

ber 4, 2008. (Kastell Decl., ¶¶ 10–13; Gomez–Sanchez Decl. at Ex. D.)

6. The Preliminary Informal Review Committee never convened before plaintiff's appointment to the Woodhull medical staff expired on November 5, 2009. (Hartman Decl., ¶ 12; Pendergrass Decl. at Ex. 5, p. 167.)

7. Plaintiff first contacted Woodhull's EEO office to file a complaint. (Pl.'s Depo., p. 164.) In her EEOC charge, plaintiff explains that:

[o]n April 1, 2009, I was informed by the Woodhull Hospital EEO office that I needed to contact Neal Glasser the New York University (NYU) affiliate; this was required because I am an employee of NYU. On April 3, 2009, I went to Mr. Glasser's office to file my EEO complaint, at that time I was informed by Mr. Glasser that Reggie Odom, Vice President of Employee and Labor Relations, was the proper person for me to file my complaint with. On April 10, 2009, I met with Mr. Odom for more than two hours where I explained the adverse employment action taken against me by Dr. Kastell[.]

Depo., p. 164; Gomez–Sanchez Decl. at Ex. T.) Plaintiff testified that she filed an internal complaint against Dr. Kastell because of the "blatantly outrageous" allegations that he made against her in the request for corrective action. (Pl.'s Depo., p. 164.) Odom informed plaintiff by telephone on April 20, 2009 that her complaint could not be substantiated. (Gomez–Sanchez Decl. at Ex. T; Pl.'s Depo., p. 170.) On June 4, 2009, Odom informed plaintiff in writing that her complaints regarding Dr. Kastell's actions "simply do not support a claim of discrimination." (*Id.*) Odom copied Dr. Kastell and Dr. Fishkin on his June 4, 2009 letter to plaintiff. (*Id.*)

On April 17, 2009, Dr. Kastell presented the October 20, 2008 incident to NYCHHC's Board of Directors because the case had been reported to the New York State Department of Health pursuant to Section 2805–*l* of the New York Public Health Law. (Pendergrass Decl. at Ex. 6, p. 199; Kastell Decl., ¶¶ 16, 18.) Cases are presented anonymously to the Board of Directors; the subject doctor's identity is not disclosed. (Kastell Decl., ¶ 17.) After the presentation, the President of NYCHHC demanded that plaintiff be reassigned from seeing patients until an investigation was completed. (Pendergrass Decl. at Ex. 6, p. 200; Kastell Decl., ¶ 19.) On April 23, 2009, Dr. Fishkin "temporarily re-assigned [plaintiff] to work in Quality Management . . . effective immediately." (Gomez–Sanchez Decl. at Ex. U.) Plaintiff was assigned to a literature search in Quality Management regarding gynecological malignancies. (Gomez–Sanchez Decl. at Ex. V.) Plaintiff's clinical privileges at Woodhull were not affected by the reassignment. (Pendergrass Decl. at Ex. 6, p. 204.)

On September 9, 2009, plaintiff submitted an application for reappointment to the Woodhull medical staff. (Gomez–Sanchez Decl. at Ex. Y.) On October 16, 2009, Dr. Kastell recommended that plaintiff should be denied reappointment to the medical staff and that her clinical privileges to practice medicine at Woodhull should not be renewed. (Gomez–Sanchez Decl. at Ex. AA and BB.) Dr. Kastell gave plaintiff an unsatisfactory rating on her Medical/Dental Staff Reappointment Roster and based his recommendation regarding plaintiff's reappointment on a review of her Quality Assurance file. (Gomez–Sanchez Decl. at Ex. AA.) By letter dated October 19, 2009, Dr. Kastell recommended to the Credentials Committee that plaintiff's membership on the medical staff and her clinical privileges should not be renewed. (Gomez–Sanchez Decl. at Ex. CC.) Dr. Kastell based his recommendation on the October 20, 2008 delivery as well as four other incidents that occurred between September and November 2008, and concluded that the medical treatment provided by plaintiff "is exemplary of poor clinical judgment and skills of such poor quality to be a threat to the welfare and safety of patients." (*Id.*) On October 26, 2009 and October 28, 2009, the Credentials Committee and Dr. Fishkin respectively recommended that plaintiff's membership on the medical staff and her clinical privileges should not be renewed. (Gomez–Sanchez Decl. at Ex. AA and BB.)

At a meeting on October 29, 2009, the Executive Committee of the Medical Staff, chaired by Dr. Urcuyo, reviewed the recommendation of the Credentials Committee and decided to deny plaintiff's application for reappointment to the medical staff. (Gomez–Sanchez Decl. at Ex. DD.) By letter dated October 30, 2009, Dr. Urcuyo informed plaintiff that the Executive Committee denied her application for reap-

(Gomez–Sanchez Decl. at Ex. HH.)

pointment to the medical staff and that her current appointment would expire on November 5, 2009. (*Id.*) By letter dated November 8, 2009, plaintiff informed Dr. Urcuyo that she sought to appeal the denial of her application for reappointment. (Gomez–Sanchez Decl. at Ex. FF.) The Bylaws provide that "any practitioner who has received notice of a non-reappointment [or] curtailment of privileges . . . is entitled to a hearing pursuant to the procedures set forth in this Article if he/she has requested such a hearing within twenty (20) working days of receiving notice of the adverse action." (Gomez–Sanchez Decl. at Ex. K., p. 26.) Plaintiff never received a hearing. (Defs.' 56.1 Statement, ¶ 120.) NYCHHC was responsible for scheduling the hearing. (Docket entry 50, Hartman Decl., ¶ 13.)

On August 7, 2009, plaintiff filed an Intake Questionnaire with the Equal Employment Opportunity Commission ("EEOC"), alleging that NYCHHC and Woodhull discriminated against her on the basis of race and sex, and retaliated against her. (Gomez–Sanchez Decl. at Ex. GG.) Specifically, plaintiff complained that Dr. Kastell took disciplinary action against her in March 2009 and Dr. Fishkin "change[d] [her] job description" in April 2009. (*Id.*) Plaintiff filed an Amended Charge of Discrimination against NYCHHC and NYU on September 29, 2009, alleging that she was discriminated against on the basis of her race and sex, retaliated against, and subjected to a hostile work environment. (Gomez–Sanchez Decl. at Ex. HH and II.) Plaintiff filed a further amendment to her charges on December 7, 2009, alleging that NYCHHC and NYU retaliated against her for filing a charge of discrimination with the EEOC when they denied her application for reappointment and reported her alleged negligence to the New York State Department of Public Health. (Gomez–Sanchez Decl.

at Ex. JJ.) On December 28, 2009, the EEOC issued plaintiff a right to sue letter regarding her charge against NYU. (Gomez–Sanchez Decl. at Ex. KK.) On January 7, 2009, the EEOC issued plaintiff a right to sue letter regarding her charge against NYCHHC. (Gomez–Sanchez Decl. at Ex. LL.)

## PROCEDURAL HISTORY

Plaintiff commenced this civil action *pro se* on March 30, 2010. (Docket entry 1.) Counsel appeared on plaintiff's behalf and plaintiff filed an amended complaint with defendants' consent on December 15, 2010. (Docket entries 24 and 26.) Defendants answered the amended complaint and the parties conducted discovery until April 15, 2011, at which point defendants sought permission to move for summary judgment. (Docket entries 27, 28, and 32.) The Court held an unsuccessful settlement conference on July 19, 2011, after which a briefing schedule was set for defendants' summary judgment motion. Plaintiff concurrently sought leave to amend the complaint to add a new retaliation claim under Title VII and to drop her breach of contract claim. (Docket entry 35.) The Court denied plaintiff's motion to amend and dismissed plaintiff's breach of contract claim pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. (Docket entries 44 and 61.)

Defendants served plaintiff with their motion for summary judgment on September 19, 2011. (Docket entry 45.) Plaintiff sought two extensions of time to oppose defendants' motion for summary judgment and on the deadline for plaintiff to file her opposition, plaintiff's counsel moved to withdraw from this case. (Docket entries 38, 39 and 40.) The Court denied counsel's motion to withdraw and directed plaintiff to oppose defendants' motion for summary judgment. (Docket entry 42.)

Plaintiff has now opposed defendants' motion for summary judgment and defendants have replied. (Docket entries 57 and 60.)

## DISCUSSION

### I. Standard of Review

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); *see also Baker v. Home Depot,* 445 F.3d 541, 543 (2d Cir.2006) (resolving all ambiguities and drawing all inferences in favor of the non-moving party on summary judgment). The facts here are viewed in the light most favorable to plaintiff.

However, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

### II. Withdrawn Claims

Plaintiff's amended complaint asserts claims for race and sex discrimination under 42 U.S.C. § 1981, conspiracy under 42 U.S.C. §§ 1985 and 1986, and negligent and intentional infliction of emotional distress under New York common law. (Am. Compl., ¶¶ 62–74, 90–107, 128–141.) In her opposition to defendants' motion for summary judgment, plaintiff concedes that these claims should be dismissed. Specifically, plaintiff states that "there is no evidence, in the record that the conduct of Defendants w[as] motivated by Plaintiff['s] race [or] sex," and that "the proof in this matter does not establish the necessary element of a 42 U.S.C. §§ 1985 and 1986" claim. (Docket entry 58–2, Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp."), pp. 4, 7.) Plaintiff also concedes that her claims under 42 U.S.C. § 1983 against Woodhull, NYU, NYCHHC, and the City of New York should be dismissed. (*Id.* at p. 4.) Accordingly, defendants' motion for summary judgment should be granted on plaintiff's claims pursuant to 42 U.S.C. §§ 1981, 1985 and 1986, and plaintiff's claims pursuant to 42 U.S.C. § 1983 against defendants Woodhull, NYU, NYCHHC, and the City of New York. Plaintiff's claims for negligent and inten-

tional infliction of emotional distress should likewise be dismissed.

## III. Primary Jurisdiction

 Defendants argue that the Court should decline jurisdiction under the doctrine of primary jurisdiction over any dispute in this action concerning the medical standards and medical judgment utilized by defendants when they removed plaintiff from obstetrics, reassigned her to Quality Management, and denied her application for reappointment. "The doctrine of primary jurisdiction is concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Ellis v. Tribune TV. Co.*, 443 F.3d 71, 81 (2d Cir.2006) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). "Recourse to the doctrine of primary jurisdiction is thus appropriate 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *Id.* (quoting *W. Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161).

 Under Section 2801–b of the New York Public Health Law, a hospital may deny staff membership or professional privileges to a physician based only on reasons related to "standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant," and an aggrieved physician must file a complaint with the Public Health Council. N.Y. Pub. Health Law § 2801–b(1) and (2). "[A] federal district court must refrain from hearing a damages claim by a physician where the legitimacy of the termination of the physician's privileges is dispositive, and the claim has not first been filed before the PHC." *Bauman v. Mount Sinai Hosp.*, 452 F.Supp.2d 490, 500 (S.D.N.Y.2006) (citing *Johnson v. Nyack Hosp.*, 964 F.2d 116, 121 (2d Cir. 1992)). However, Courts in the Second Circuit have found that the primary jurisdiction doctrine does not apply to constitutional and discrimination claims where the medical reason for the termination of professional privileges would not be dispositive of a plaintiff's claims. *See Chandra v. Beth Isr. Med. Ctr.*, No. 09 Civ. 6619(RMB)(GWG), 2010 WL 5600373, at *6, 2010 U.S. Dist. LEXIS 139977, at *18 (S.D.N.Y. Dec. 2, 2010) (adopted by *Chandra v. Beth Israel Med. Ctr.*, No. 09 Civ. 6619(RMB)(GWG), 2011 WL 180801, at *2–3, 2011 U.S. Dist. LEXIS 4829, at *6–7 (S.D.N.Y. Jan. 19, 2011)) (concluding that the doctrine of primary jurisdiction does not apply to plaintiff's national origin discrimination claim arising from his termination from the hospital); *Deshpande v. Medisys Health Network, Inc.*, No. 07–CV–375 (NGG)(VVP), 2008 WL 2004160, at *2–4, 2008 U.S. Dist. LEXIS 37444, at *5–11 (E.D.N.Y. May 7, 2008) (declining to apply doctrine of primary jurisdiction to plaintiff's Title VII retaliation claim); *Hamad v. Nassau Cnty. Med. Ctr.*, 191 F.Supp.2d 286, 298 (E.D.N.Y.2000) ("[W]hether or not defendants properly terminated plaintiff's privileges is not dispositive of the constitutional claims before this Court ... [because] even if PHC finds that defendants had a legitimate reason for the termination of Plaintiff's surgical privileges, Plaintiff may still prevail in this action if he can prove that the proffered reasons were merely pretext for discrimination."). In this case, plaintiff claims that defendants subjected her to a hostile work environment, unlawfully retaliated against her, and deprived her of due process. As the medical reasons for defendants' actions are not dispositive of plaintiff's constitutional and discrimination claims, the doctrine of primary jurisdiction does not resolve this case.

## IV. Plaintiff's Claims Pursuant to Title VII

### A. Hostile Work Environment Claim

 Defendants argue that plaintiff failed to exhaust her hostile work environment claim with the EEOC. "Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir.2006) (citing 42 U.S.C. § 2000e–5); *see McPherson v. N.Y. City Dept. of Educ.*, 457 F.3d 211, 213 (2d Cir.2006) ("A private plaintiff under Title VII must satisfy two conditions before commencing suit in federal court."). "This exhaustion requirement is an essential element of Title VII's statutory scheme, and is designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Shah v. N.Y. State Dept. of Civil Serv.*, 168 F.3d 610, 614 (2d Cir.1999) (internal quotation marks and citations omitted). "[D]efendants are entitled to insist that plaintiffs comply" with the exhaustion of administrative remedies through the EEOC. *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir.2000).

 "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Williams*, 458 F.3d at 70 (citation omitted). A claim is considered reasonably related "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made," if the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge," or if the plaintiff "alleg[es] retaliation by an employer against an employee for filing an EEOC charge." *Id.*

"In determining whether claims are reasonably related, the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir.2003) (internal quotation marks and citation omitted). "The 'reasonably related' exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering." *Williams*, 458 F.3d at 70 (internal quotation marks and citation omitted).

The instant record reflects that plaintiff initially filed an Intake Questionnaire with the EEOC on August 7, 2009. (Gomez–Sanchez Decl. at Ex. GG.) In the Intake Questionnaire, plaintiff claimed that NYCHHC and Woodhull discriminated against her on the basis of race and sex, and retaliated against her. (*Id.*) Specifically, plaintiff complained that Dr. Kastell took disciplinary action against her in March 2009 and Dr. Fishkin "change[d][her] job description" in April 2009. (*Id.*) Plaintiff filed an Amended Charge of Discrimination against NYCHHC and NYU on September 29, 2009, alleging that she was discriminated against on the basis of her race and sex, retaliated against, and subjected to a hostile work environment. (Gomez–Sanchez Decl. at Ex. HH and II.) Plaintiff attached a five page statement to her Amended Charge, in which she described Dr. Kastell's allegedly hostile conduct as well as the adverse employment actions taken against her. (*Id.*) Specifically, plaintiff alleged that Dr. Kastell yelled at her during the October 21, 2008 meeting, removed her from obstetrics in November 2008, and

requested corrective action against her in March 2009. (*Id.*) Plaintiff further alleged that she was reassigned to Quality Management in April 2009. (*Id.*) Plaintiff's Amended Charge raised her hostile work environment claim with the EEOC and included factual allegations of Dr. Kastell's abusive conduct. Plaintiff's instant hostile work environment claim is based on the exact same allegations raised by plaintiff in her EEOC charges. Accordingly, plaintiff exhausted her administrative remedies regarding her hostile work environment claim.

■■■■ "[A] plaintiff seeking to establish a Title VII hostile work environment claim must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 79 (2d Cir.2010) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "This severe or pervasive standard 'has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Id.* (quoting *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002)) (internal quotation marks and citation omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. "To withstand summary judgment, a plaintiff

must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) (internal quotation marks and citation omitted).

■■■■ "Even when a plaintiff establishes that she was exposed to an objectively and subjectively hostile work environment, 'she will not have a claim ... unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class.'" *Bermudez v. City of New York,* 783 F.Supp.2d 560, 578 (S.D.N.Y.2011) (quoting *Sullivan v. Newburgh Enlarged Sch. Dist.,* 281 F.Supp.2d 689, 704 (S.D.N.Y.2003)). "An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." *Forts v. City of N.Y. Dep't of Corr.,* No. 00 Civ. 1716(LTS) (FM), 2003 WL 21279439, at *4, 2003 U.S. Dist. LEXIS 9347, at *13 (S.D.N.Y. June 4, 2003) (citations omitted).

Neither plaintiff's amended complaint nor her memorandum of law specify what conduct she is claiming constituted a hostile work environment based on her membership in a protected class. The instant record reflects that Dr. Kastell met with plaintiff on October 21, 2008 regarding her handling of the October 20, 2008 delivery. At the meeting, Dr. Kastell went over the heart monitoring strips with plaintiff and told plaintiff that she should have delivered the baby sooner. Plaintiff claims that Dr. Kastell's conduct at the meeting was abusive, describing it as "totally inappropriate" and "very condescending." (Pl.'s Depo., p. 64.) Dr. Kastell "told [her] that he had not ever seen a patient tak[en] care of in the fashion that [she] had taken care

of a patient, since he had been there." (*Id.* at p. 63.) Plaintiff testified that "when [she] spoke to him and [she] was trying to explain, his attitude was that, like he did not want to hear anything that [she] had to say," and that Dr. Kastell "made [her] so upset during this conversation, that [she] was almost in tears." (*Id.* at p. 64.) Shortly thereafter, in November 2008, Dr. Kastell reassigned plaintiff from the obstetrical management of patients, and on March 10, 2009, he requested corrective action against plaintiff. On April 23, 2009, plaintiff was reassigned to Quality Management, and on October 30, 2009, plaintiff's application for reappointment to the medical staff was denied based on the recommendation of Dr. Kastell, Dr. Fishkin, and the Credentials Committee.

Plaintiff perceived Dr. Kastell's conduct to be hostile and abusive. However, even if a reasonable person also would have found Dr. Kastell's conduct to be hostile or abusive, plaintiff has presented no evidence that Dr. Kastell's conduct was based on her membership in a protected class, such as her race or sex.[8] Plaintiff does not claim that Dr. Kastell ever made any remarks regarding her race or sex. When asked at her deposition why she believed Dr. Kastell yelled at her based on her race and gender, plaintiff testified that she "had never seen him yell at any of the white female physicians there," and that "Dr. Kastell never yelled at a male physi-

cian." (Pl.'s Depo., pp. 66, 76.) Plaintiff testified that she believed Dr. Kastell removed her from obstetrical duties based on her race and gender because she "had never seen him do it to any other, any white, my white colleagues ... who had horrendous outcomes." (*Id.* at pp. 120–121.) Plaintiff further testified that she believed Dr. Kastell requested corrective action against her based on her race and gender because "he had not done this to anyone else" and "this was just continual behavior that he had started since October of 2008." (*Id.* at pp. 158–159.) In fact, plaintiff concedes in her opposition to defendants' motion for summary judgment that "there is no evidence, in the record that the conduct of Defendants were motivated by Plaintiff['s] race o[r] sex." (Pl.'s Opp., p. 4.) Even when viewed in the light most favorable to plaintiff, the instant record does not reflect any evidence that Dr. Kastell's alleged abusive conduct was based on plaintiff's sex, race, or any other protected category.[9] Accordingly, defendants' motion for summary judgment should be granted on plaintiff's hostile work environment claim under Title VII. As the same standard applies, defendants' motion for summary judgment should also be granted on plaintiff's hostile work environment claim under Section 296 of the New York State Executive Law. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.

8. Neither plaintiff's amended complaint nor her memorandum of law specify the basis of her hostile work environment claim.

9. A retaliatory hostile work environment may constitute an adverse employment action sufficient to give rise to Title VII liability. *See Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir.1999); *Salerno v. City Univ. of N.Y.*, No. 99 Civ. 11151(NRB), 2003 WL 22170609, at *10–11, 2003 U.S. Dist. LEXIS 16474, at *36 (S.D.N.Y. Sept. 18, 2003). To the extent plaintiff claims that Dr. Kastell engaged in a retaliatory hostile work

environment, plaintiff's claim cannot withstand defendants' motion for summary judgment. The record reflects that plaintiff did not internally complain about discrimination until April 10, 2009, when she met with Reginald Odom. Therefore, Dr. Kastell's allegedly abusive conduct during the October 21, 2008 meeting, his November 2008 reassignment of plaintiff from obstetrics, and his March 10, 2009 request for corrective action could not have been causally related to plaintiff's subsequent complaint to Odom in April 2009.

1 (2d Cir.2000) ("The identical standards apply to employment discrimination claims brought under Title VII ... [and] New York Executive Law § 296.").

## B. Retaliation Claim

Retaliation claims under Title VII are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Gorzynski v. Jet-Blue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010) (citation omitted). Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case." *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008). "The burden of proving a prima facie case of retaliation is *de minimis.*" *Westbrook v. City Univ. of N.Y.,* 591 F.Supp.2d 207, 233 (E.D.N.Y.2008) (citation omitted). To establish a prima facie case of retaliation under Title VII, a plaintiff "must show (1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski,* 596 F.3d at 110 (citation omitted). If a plaintiff establishes a prima facie case, "a presumption of retaliation arises ... [and] the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005) (citation omitted). "Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citation omitted). Plaintiff claims that defendants retaliated against her when they reported her to the New York State Department of Health's Office of Professional Misconduct, reassigned her to Quality Management, and denied her application for reappointment to the medical staff at Woodhull.[10]

Plaintiff fails to establish a prima facie case of retaliation based on the investigation by the Office of Professional Misconduct as she cannot demonstrate that the investigation was causally related to her April 10, 2009 internal complaint to Odom. The record reflects that the Office of Professional Misconduct commenced an investigation into the October 20, 2008 delivery in February 2009, two months *before* plaintiff complained of discrimination to Odom. (Gursky Decl., ¶ 9.) Moreover, Section 2805–*l* of the New York Public Health Law required Woodhull's Risk Management Department to report the neonatal death to the New York State Department of Health through the New York Patient Occurrence Reporting and Tracking System, and reports of incidents through the New York Patient Occurrence Reporting and Tracking System can trigger a separate investigation by the Office of Professional Misconduct. (*Id.* at ¶¶ 4–5, 7, 8.)

---

**10.** Plaintiff's amended complaint alleges that defendants also retaliated against her when they denied her request for leave to attend a Continuing Medical Education course scheduled for October 29 and 30, 2009. (Am. Compl., ¶¶ 53–55.) Defendants argue that the denial of plaintiff's request for leave does not amount to a materially adverse action under Title VII. (Defs.' Mem. of Law, pp. 17–18.) Plaintiff's opposition to defendants' motion for summary judgment fails to address her request to attend the Continuing Medical Education course. (Pl.'s Opp., pp. 8–9.) Accordingly, the Court deems this claim abandoned and need not address defendants' argument. *See Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) (citation omitted) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Regarding plaintiff's other claims of retaliation, the record reflects that plaintiff internally complained to Odom about Dr. Kastell's harassment on April 10, 2009, and that she was reassigned to Quality Management on April 23, 2009. Moreover, plaintiff filed charges of discrimination with the EEOC on August 7, 2009 and September 29, 2009, and her application for reappointment to the medical staff at Woodhull was denied on October 30, 2009. It is undisputed that plaintiff participated in protected activity when she internally complained about harassment by Dr. Kastell to the Vice President of Employee and Labor Relations at NYU and filed charges of discrimination with the EEOC. However, even assuming that plaintiff suffered a materially adverse action when she was reassigned to Quality Management and denied reappointment to the medical staff, plaintiff has failed to establish a prima facie case of retaliation because she fails to demonstrate causation between her protected activity and the adverse actions.

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski,* 596 F.3d at 110 (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir.2001)).[11] Here, plaintiff was reassigned to Quality Management about two weeks after complaining to Odom and denied reappointment to the medical staff one month after filing an amended charge with the EEOC. When asked at her deposition why she believed that her reassignment to Quality Management was in retaliation for making a complaint, plaintiff testified that "[a]s soon as I spoke to Mr. Odom, the next week I was taken out of the clinic—immediately, just abruptly removed from the clinic." (Pl.'s Depo., p. 182.) Ordinarily, the close temporal proximity between plaintiff's internal complaint of discrimination and her reassignment, as well as plaintiff's filing of charges of discrimination with the EEOC and her denial of reappointment would establish a sufficient inference of causation. *See Gorzynski,* 596 F.3d at 110 ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001). The instant record reflects that Dr. Kastell began taking gradual adverse employment actions against plaintiff about five months before her April 10, 2009 complaint to Odom. Shortly after the October 20, 2008 delivery, in November 2008, Dr. Kastell reassigned plaintiff from the obstetrical management of patients. Then, Dr. Kas-

---

11. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000) (citation omitted). Plaintiff offers no direct evidence of retaliatory animus or disparate treatment. Rather, plaintiff relies only on the timing of the adverse actions in relation to her complaint of discrimination in April 2009 and her charges of discrimination filed with the EEOC in August and September 2009.

tell requested that corrective action be taken against plaintiff on March 10, 2009. Dr. Kastell requested that plaintiff's clinical privileges and membership on the Woodhull medical staff be revoked and requested corrective action against plaintiff largely based on plaintiff's handling of the October 20, 2008 delivery. Given that these prior adverse employment actions undermine any inference of retaliation based on the timing of subsequent adverse actions, and that plaintiff has not presented any other evidence of causation, plaintiff fails to establish a prima facie case of retaliation based on her reassignment to Quality Management or the denial of her application for reappointment. *See Hartley v. Rubio*, 785 F.Supp.2d 165, 183 (S.D.N.Y.2011) ("[B]ecause timing is the only proffered grounds for causation, and because adverse employment action predated Hartley's filing of a complaint with the EEOC by nearly eight months, we conclude that an inference of retaliation cannot arise."); *St. Louis v. N.Y. City Health & Hosp. Corp.*, 682 F.Supp.2d 216, 236 (E.D.N.Y.2010) (dismissing retaliation claim for "failure to establish a causal nexus" where plaintiff "experienced a series of adverse employment actions well before the May 2002 protected activity occurred").

Even assuming that plaintiff could establish a prima facie case of retaliation based on her reassignment to Quality Management and the denial of her application for reappointment, plaintiff's retaliation claims still could not withstand defendants' motion for summary judgment. Defendants have set forth legitimate nondiscriminatory reasons for the adverse actions and plaintiff has failed to carry her ultimate burden of showing that defendants retaliated against her based on her protected activity. Defendants state that plaintiff was reassigned to Quality Management because the President of NYCHHC "demanded that plaintiff be removed from patient contact after a blind review of her actions with respect to the bad outcome in October 2008 because he was concerned about the quality of care she was providing to the patients at Woodhull." (Defs.' Mem. of Law, p. 18.) Moreover, Dr. Kastell recommended that plaintiff not be reappointed because of "a series of gross errors in clinical judgment, assessment of patients['] clinical conditions and negligent decision making." (*Id.*) Plaintiff does not argue that defendants' reasons are pretext for retaliation, and apart from the timing of the adverse actions, plaintiff produces no evidence giving rise to an inference of retaliation. The record reflects that Dr. Kastell and others at Woodhull responded to the neonatal death in October 2008 by taking various progressive measures with regard to plaintiff, including removing her from obstetrical duties, initiating formal disciplinary charges against her, removing her from all patient care, and eventually denying her application for reappointment. Although plaintiff asserted that "we clearly had worse outcomes several times, numerous times in the hospital," and that "my outcome can happen to anyone," plaintiff never demonstrates that she was treated more harshly than others based on her complaints of discrimination. (Pl.'s Depo., pp. 112, 120.) Moreover, the decision to reassign plaintiff to Quality Management was made "blindly" by the President of NYCHHC without knowing plaintiff's identity (as the Board considered cases anonymously), and the decision to deny plaintiff's application for reappointment was based on the same clinical incidents that led to the initiation of corrective action. On these facts, no reasonable juror could conclude that defendants reassigned plaintiff to Quality Management or denied

her application for reappointment because of her protected activity.

Accordingly, defendants' motion for summary judgment should be granted on plaintiff's claims of retaliation under Title VII. As the same standard applies, defendants' motion for summary judgment should also be granted on plaintiff's retaliation claims under Section 296 of the New York State Executive Law. *See Weinstock*, 224 F.3d at 42 n. 1.

## V. Plaintiff's Due Process Claims Pursuant to 42 U.S.C. § 1983

■■■ "In order to prevail on a Section 1983 claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Jackson v. Roslyn Bd. of Educ.*, 652 F.Supp.2d 332, 338 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285–86 (2d Cir.2001)); *see Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) ("[P]rocedural due process questions [are examined] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citations omitted), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

### A. Property Interest

■■■ Property interests are not created by the Constitution, but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that se-cure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). To have a property interest in a benefit, a person must have a legitimate claim of entitlement to the benefit, not just an abstract need, desire, or unilateral expectation for it. *Id.* "To determine whether a contractual right can be characterized as a constitutionally protected property interest, 'a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right.' " *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir.2003) (quoting *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir.1991)). "However, 'not every contractual benefit rises to the level of a constitutionally protected property interest.' " *Id.* (quoting *Ezekwo*, 940 F.2d at 782).

■■■ Plaintiff argues that she had a protected property interest in continued employment at Woodhull and that defendants deprived her of that interest when they denied her application for reappointment to the medical staff. The Court does not agree. Plaintiff did not have a legitimate claim of entitlement to reappointment to the medical staff at Woodhull. A public employee lacks a protected property interest in reappointment where neither the terms of the original appointment nor any state statute, rule, or policy secures an interest in reappointment for the next year. *Roth*, 408 U.S. at 578, 92 S.Ct. 2701; *see Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir.2010) ("In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause.") (quoting *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir.

1988)); *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 313 (2d Cir.2002) ("A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge.").

 The Woodhull Bylaws provide that appointments to the medical staff are generally for a two-year period. However, a doctor who has been the subject of disciplinary action may be appointed for less than two years. Plaintiff served on the Woodhull medical staff from 2000 through 2008 pursuant to four consecutive two-year contracts. On December 11, 2008, plaintiff was reappointed to the medical staff at Woodhull for a period of one year, ending November 5, 2009. By letter dated October 30, 2009, the Executive Committee of the Medical Staff denied plaintiff's application for reappointment and advised plaintiff that her appointment "will expire on November 5, 2009." (Gomez–Sanchez Decl. at Ex. DD.) Just as in *Roth,* by the terms of her appointment, plaintiff's employment was set to terminate on a date certain and there was no provision for the renewal of her contract "absent 'sufficient cause.'" *Roth,* 408 U.S. at 578, 92 S.Ct.

2701. Although plaintiff correctly states that the Bylaws set forth procedures regarding applications for reappointment to the medical staff and appeals of any denial of reappointment, plaintiff points to no provision of the Bylaws that provides plaintiff with an entitlement to reappointment to the medical staff. Therefore, plaintiff lacked a protected property interest in her reappointment to the medical staff at Woodhull.[12] *See Radolf v. Univ. of Conn.,* 364 F.Supp.2d 204, 212–13 (D.Conn. 2005) (holding that plaintiff "had no protectable property interest in a discretionary reappointment as Director of the Center for Microbial Pathogenesis"); *Webb v. Kenney,* 234 F.Supp.2d 197, 201–02 (E.D.N.Y.2002) (holding that medical resident did not have property interest in residency of five years where "the appointment was on a year-to-year basis and that the decision to re-appoint was at the sole discretion of the department director"). As plaintiff had no protected property interest in her reappointment, plaintiff was not entitled to a hearing or any other procedural protection under the Due Process Clause of the Constitution. Accord-

---

**12.** To the extent that plaintiff claims that defendants deprived her of property without due process when they removed her from obstetrics in November 2008 and reassigned her to Quality Management in April 2009, plaintiff's due process claims based on these property interests cannot withstand defendants' motion for summary judgment. "Where the claimed right is no more than a claim to a particular work assignment or fringe benefit it will generally not be found to rise to the level of a constitutionally protected property right." *Adler v. Cnty. of Nassau,* 113 F.Supp.2d 423, 429 (E.D.N.Y.2000). "Absent ... a written delineation [within a physician's clinical privileges], a physician cannot be said to have a 'clear entitlement' to be placed within a particular area or unit of the hospital." *Rafiy v. Nassau Cnty. Med. Ctr.,* 218 F.Supp.2d 295, 303 (E.D.N.Y.2002) (concluding that plaintiffs lack a protected property interest in their on-

call and clinic assignments at the hospital); *see Clarke v. City of New York,* No. 98 CV 3715(ILG), 2001 WL 876926, at *9, 2001 U.S. Dist. LEXIS 11136, at *26 (E.D.N.Y. Aug. 1, 2001) ("Plaintiff can point to no state law or provision of a collective bargaining agreement which would give him even a colorable property interest in a particular department" at the hospital.). Here, plaintiff has pointed to no provision of her clinical privileges, the CBA, or the Bylaws that would entitle her to any particular assignment within Woodhull. Although clinical staff privileges at a public hospital constitute a property interest protected by the Due Process Clause, *Greenwood v. N.Y. Office of Mental Health,* 163 F.3d 119, 122 (2d Cir.1998), the record does not reflect that plaintiff's clinical privileges were affected when she was removed from obstetrics or reassigned to Quality Management.

ingly, defendants' motion for summary judgment should be granted on plaintiff's due process claim based on an alleged property interest in her continued employment at Woodhull.

### B. Liberty Interest

■■■■■ "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir.2004) (citations omitted). To establish a due process claim based on a liberty interest, a plaintiff must demonstrate a stigma to her good name plus "some other tangible element in order to rise to the level of a protectable liberty interest." *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994) (citing *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). To establish a stigma-plus claim under the Due Process Clause, a plaintiff must show that: "(1) the government made stigmatizing statements about him, statements that call into question his good name, reputation, honor, or integrity; (2) the stigmatizing statements were made public; and (3) the stigmatizing statements were made concurrently with, or in close temporal proximity to, his dismissal from government employment." *Spang v. Katonah–Lewisboro Union Free Sch. Dist.*, 626 F.Supp.2d 389, 395 (S.D.N.Y.2009) (citing *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir.2006)).

■■■ "[S]tatements that 'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession' will satisfy the stigma requirement." *Segal*, 459 F.3d at 212 (quot-

ing *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630–31 (2d Cir.1996)). Although neither plaintiff's amended complaint nor memorandum of law identify the specific statements that were stigmatizing, the record reflects that both Dr. Kastell's March 10, 2009 request for corrective action and his October 19, 2009 recommendation to the Credentials Committee concluded that the medical treatment provided by plaintiff "is exemplary of poor clinical judgment and skills of such poor quality to be a threat to the welfare and safety of patients." (Gomez–Sanchez Decl. at Ex. D and CC.)

■■■ Termination from public employment satisfies the "plus" element of a stigma-plus claim. *Segal*, 459 F.3d at 212. Moreover, the Second Circuit has held that "the deprivation of a property interest satisfies the 'plus' prong of stigma plus." *Greenwood*, 163 F.3d at 124. However, "outside that context [of a termination], 'it is not entirely clear what the 'plus' is.'" *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir.2003) (quoting *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.1989)). Plaintiff contends that the denial of her application for reappointment to the Woodhull medical staff thus satisfies the "plus" element of her stigma-plus claim.

■■ Even assuming that Dr. Kastell's statements regarding plaintiff's clinical judgment and skills were sufficiently stigmatizing and that the denial of plaintiff's application for reappointment satisfies the "plus" element, plaintiff's stigma-plus claim still could not withstand defendants' motion for summary judgment. In the context of non-tenured public employees, the Second Circuit has held that "the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim." *Segal*, 459 F.3d at 214. The Second Circuit reasoned that "[b]ecause an at-will

employee lacks a property interest in continued employment, she has no right to a particular outcome following an adequate name-clearing hearing; the government is simply required to provide her with an opportunity to salvage her name." *Id.* at 216.

■ As discussed above, plaintiff lacked a property interest in her continued employment at Woodhull. As a non-tenured public employee without a property interest in continued employment, the availability of an Article 78 proceeding in state court provided plaintiff with "sufficient procedural protection as [a] post-deprivation name-clearing hearing[ ]." *Spang,* 626 F.Supp.2d at 397 (dismissing plaintiff's stigma-plus claim where "adequate post-deprivation remedies were available, and Spang failed to avail himself of them"). Although plaintiff never received a hearing pursuant to the Bylaws on her appeal of the denial of her application for reappointment, she could have brought an Article 78 proceeding in state court to clear her name. Even though plaintiff did not avail herself of the state court process, she could have. Again, the availability of a post-deprivation name-clearing hearing by way of an Article 78 proceeding in state court is sufficient procedural protection to satisfy due process in this case. Therefore, defendants' motion for summary judgment should be granted on plaintiff's due process claim based on a liberty interest.[13]

## CONCLUSION

Accordingly, it is respectfully recommended that defendants' motion for summary judgment should be granted and plaintiff's action should be dismissed.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Plaintiff's counsel shall serve a copy of this Report on plaintiff and file proof of service with the Court.

SO ORDERED.

---

**13.** Defendants argue that Drs. Kastell, Fishkin, and Urcuyo are entitled to qualified immunity on plaintiff's due process claims. However, as the Court finds that plaintiff's constitutional rights were not violated, the Court need not reach the issue of whether the individual defendants are entitled to qualified immunity. *See Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir.2007) (If a government official's conduct violates no constitutional right, "there is no necessity for further inquiries concerning qualified immunity.").